Alright. We've got two counsel that are with us remotely today. We'll say thank you because you notified us in an appropriate manner and we appreciate you doing so. We're happy to have you on the video with us and that's not to disparage you, Mr. Meehan. We're happy to have you in person too. And we're happy to hear from Mr. Adams whenever you're ready. Thank you, Your Honor. May it please the Court, my name is Norris Adams and I represent Jody Rose in her capacity as the Administratrix of the Kyrie Devon Olin Estate. When I thought about how to talk to the Court about the various issues, and I think there's three or four pretty big issues, it kept coming back to me as almost like a circle's getting bigger, but there's kind of a core issue that was the heart of Judge Mullin's opinion below, that is whether or not this kind of relief that the estate is seeking is appropriate equitable relief under Section A3 of the Arrested Statute 502. Kind of growing out from there, there's the secondary question of whether the A1B claim is valid, which was dismissed by the magistrate judge prior to Judge Mullin reviewing it. And then there's kind of the sort of bigger issue of all of them that is whether or not you can bring multiple claims to relief under A1B and A3 appropriately under this Court and Supreme Court precedent. So just to discuss it in sort of that manner, I think the A3 claim that we've alleged, I think Judge Mullin incorrectly dismissed it. I think it was based on a misapplication of Amara, and that in fact this Court ruled in Peters versus Aetna three months prior to Judge Mullin's decision in a way that I think would have governed his decision. He did not reference Peters, so I can only think that it didn't come up, but had he- Counsel, can you start by helping me understand what the, for the A3 claim, just focusing on the A3 claim, what you understand or what you're alleging or presenting to this Court as the loss or injury that you're seeking a remedy for? Yes, Your Honor. The loss was the loss of the ability to have the heart transplant, the monetary value of the heart transplant that led to Mr. Holman's death, and associated benefits, the related medical care surrounding- And is that, so I understand that, the loss of the procedure, and then I also understand separately there's sort of an unjust enrichment theory that is sort of an injury of sorts, but is there anything else? Are those the two different pieces of this? There's sort of an unjust enrichment from keeping the money that would have been spent on the surgery, and then there's like a loss theory that is the loss of the procedure. Is there anything else, or are those the two sort of injuries, remedies that you're seeking to address? No, that's exactly right, Your Honor. Those are the two, and those are the two discussed in Amara, and the two really in-depth discussed in Peters. The counsel, if I could, before you get into those two things, on the unjust enrichment theory, I mean, looking at your complaint, I mean, I think in the prayer for relief, maybe you have one paragraph that lists a few equitable theories, but when I read your allegations, everything you say you're seeking equitably is benefits. It's not to prevent the unjust enrichment. It's to obtain what you claim are benefits. If there's something other than that for relief, if you could point me to that, and feel free to do it later in rebuttal. I don't want to distract you too much, but I didn't see that in the complaint. Yeah, absolutely, Your Honor. I think it is in the complaint explicitly and implicitly. It's explicitly in there in, I believe, paragraphs 107 and 129, where we talk about failure to provide this kind of relief will give plan administrators the incentive to save their financial resources by denying such claims. I think those two are explicitly on it. We also allege variously that the failure to act for the exclusive purpose of providing the benefits is a violation of the duty of loyalty. Then I think just kind of generally the narrative story of the facts show that by its actions on its own, it did save itself the cost of all of this expensive treatment. Do you agree in that context that the only entity that's at issue that saved money or was unjustly enriched is PSA because it's a self-funded plan? I mean, I get your other claim extends to the other two, but the unjust enrichment seems limited to PSA. Am I right thinking about that? Because they're the only ones that kept money that you allege they should have had to pay. Well, Your Honor, I certainly agree with you that PSA is the direct financial beneficiary under the unjust enrichment claim. But I would say the other defendants are also, and obviously this was decided on the pleading stage, so we haven't developed a lot of the record yet. But the other defendants benefit financially potentially from making cost savings for their client. They've contracted with PSA. There's lots of third-party administrators, claims administrators out there in PSA. There are no allegations to that. I mean, you're speculating there might be some contingency story on loss, but we're fairly far afield from the complaint at this point, aren't we? Your Honor, I appreciate that. We can't allege that, for example, UMR gets financial benefits from denying a certain amount of claims or saving money because we don't have any of that information yet in discovery. So we've alleged the relationships that UMR's relationship with Quantum, UMR's relationship with PSA, and that they're hired, they don't do it for free, that this is all part of the relationship between the parties. But to know exactly what kind of incentives might be in contracts, what standards they might need to meet, what causes the renewal, things like that would be significant. So, all right, so moving to the second piece on the other, on the, what I'll call the servicers, so the PSA and then the servicers, MC, MC, UMR, et cetera. Help me understand what the allegations are that they're more than ministerial in role. It sort of goes to whether they actually have a fiduciary duty at all. And I'm not saying that you can't imagine facts. What I'm asking is like, what have you alleged that gets you over that hurdle? Yes, Your Honor. Well, first of all, I've kind of answered that in two ways. One, UMR and Quantum are actual named fiduciaries in the plan. And so, their role in being named fiduciaries would make them appropriate parties. But also, in the Fourth Circuit, claims are allowed to be brought against the plan as such, but also any entities that have any control over the plan, and any entities that have discretionary decision-making authority over the plan. So, they're named as the claims administrator. They're named as the claims appeal fiduciary. One of the denial letters that was on Quantum and PSA letterhead said, UMR will make the final determination on benefits on this medical claim. Quantum, they use Quantum's guidelines. Quantum was on a determination letter by itself and on one with PSA. So, the fact that these entities are pretty clearly exercising discretionary authority qualifies under mounds of the Fourth Circuit precedent to be held responsible for under both these claims. Counsel, if I could, I want to follow up a little bit. You mentioned the Amara case. And our Peters case. And I'm not sure how this really works, given the text of A3. But nevertheless, the Supreme Court has a lot of cases that takes a pretty nuanced view of these equitable claims. And while Amara says what it says, the Supreme Court, four years later, may have kind of redirected parties, litigants, other courts to the Great Western and the Mertens case. And if you look at Martinell and Great Western, they seem to be whether that makes a lot of sense to me, that seems to be what they're talking about. Whereas, if it's a claim against the general assets of a party, that, in essence, is a compensatory claim. On the other hand, if it's a claim against a discrete identifiable fund, it may not be. Do you agree with how I'm assessing that? And what does Amara do? I'm having a little trouble knowing where, what to do in light of all that. But it doesn't seem that your claim deals with the type of, you know, equitable lien type fund that is talked about in other cases, unless I'm misunderstanding something. Your Honor, your analysis is exactly right, which is impressive because it took me probably 15 years to figure out those cases. It's exactly right, but it doesn't affect this case. Mertens and Newton, I think, are both good law still. Martinell affirms that. But it doesn't apply, but it doesn't change anything in Amara. The distinction in those cases were they were all involving suits against non-fiduciaries. I think all of them came up as the fiduciary trustee suing a plan participant. And, you know, for example, the classic situation that that comes up in, in these cases, is when a medical plan has paid for services. And then the plaintiff goes ... I think you're wrong about Mertens. I may be wrong, but I didn't ... I thought Mertens was a fiduciary. I get Great West was that direction, right, where it's the fiduciary suing the beneficiary. But Mertens is the beneficiary suing the fiduciary, isn't it? I don't believe so, Your Honor. And I believe Amara clarified that all Mertens does at its core is bars money damages against non-fiduciaries. So, if that's right, counsel, your position is that if you're talking about a claim against a non-fiduciary, you have to have this kind of lean concept. But if you got a claim for breach of fiduciary duty, then you get ethical claims, whether they're monetary in nature or not? Yes. Yes, Your Honor. And that's exactly what Amara said. Amara said, look, we're not changing these other cases. We're kind of clarifying how they apply and how they work. But there's nothing in equity that prevents a plan participant for suing a fiduciary for compensatory damages. And so, that's a big distinction between there. Moreover, Mottenel didn't address surcharge. It was consistent with the Mertens holding of when settlement funds are completely dissipated, then that's it. A3 doesn't allow you to go after the general asset. Amara, and I think even Mottenel, I think, fantastically affirmed that Amara was working in sort of a different arena, so to speak, than those other cases. And I think in Peters, a year and a half ago, this court was right when it said that is appropriate equitable relief. Courts of equity utilized it to provide relief in the form of monetary compensation for a loss resulting from a trustee's breach of duty or, as you mentioned earlier, to prevent that trustee's unjust enrichment. That applicability applies when you're suing fiduciaries that are entrusted over the plan. I'll move on real quick to- Is your argument on that that that doesn't matter whether it's an unjust enrichment theory or whether it's what you claim is your loss theory? Mike does. That's correct, Your Honor. Those are two different avenues to get the same surcharge relief under A3. Either one would provide the home and estate with relief against the defendant fiduciaries whose actions directly led to him dying in due hospital waiting on a heart. Because I think the, I mean, to follow up on that clarification, if you look at Amara and look at Peters, they are both in the realm of, you know, make whole remedies rather than, you know, recovering what the defendant retained claims. Am I right about that? I think Peters was really focused a lot on the unjust enrichment. Yeah, okay. Spent substantial time on the unjust enrichment component. And that actually reminds me of another point that Peters made that was in direct contradiction to Judge Mullen's decision. One thing Judge Mullen held was that because Mr. Holman died, there was no financial injury. And Peters directly held that financial injury is unnecessary to have standing for surcharge under, certainly under unjust enrichment, but I would say also under a theory of a loss flowing from the fiduciary duty. And I may want to clarify also earlier when a loss of a right. There are a number of courts that show that if there has been an ERISA violation that results in harm, and I think Peters and McCravey are two of them and Amara as well. If there is a ERISA violation to be shown that results in harm, that too could lead to the surcharge remedy of the trustee to compensate for the consequences of that. And we haven't saw, but the consequences of that are like effectively like a tort compensatory damages, right? So like the value of the life, right? So I mean, you might imagine if this was a car wreck case, right? And somebody negligently killed your client, you know, we would try to figure out the value of a life, which is obviously a hard thing to do. But that's not the claim, because that's traditional legal damages, right? You're not making that claim, or I don't see you to make that claim. No, your honor. I think because it's ERISA and it's in a unique structure, conversation I have with all of my clients, no, you can't go seek payment separate. No, you can't go do this. That's exactly right. So you have to figure out a way to quantify it in some way. The loss of the benefits, the amount of the care, the associated benefits he may have had, the associated medical care. These are all things that we would have to use to try to show damages in some way to both prevent unjust enrichment and to cure the loss. I see that my time is up and I will hold for rebuttal unless there are any other questions. Thank you, counsel. We're happy to hear from you. Sorry about that noise. Thank you, your honor. Your honor, Edward Meehan from the Groom Law Group on behalf of the PSA defendants. Your honor, a man walks into his doctor's office painfully because his sciatic is acting up. That's a nerve in the lower back, causes pain in the buttocks, lower back, sometimes instantly and temporarily paralyzing. Gets a shot, pain meds, muscle relaxer, and a script for five physical therapy sessions. Plan says, no, we'll give you three, not five. He goes to three, he's improved, he's not better. He seeks the remaining two. Eventually that decision of the denial of benefits is overturned and the plan says, you were right, you did deserve all five. In the meantime, he's done his home exercises, he's actually all better, doesn't need them. Didn't get the extra two sessions, didn't spend any money on it, doesn't need it now. Under current law, we don't monetize that. We don't say, well, it was $250 or $500 a session, here's $500, here's $1,000. Under the Rose Rule, which is what would emanate from this case, we would be faced with claims to monetize that. Can I ask you to set up what strikes me as the fundamental anomaly about this case, is that, so I want to give you three situations, all of which I think your client has to pay, and how it seems anomalous that this is the one you don't. Okay, so let's assume for the sake of argument that a good, after you denied him these benefits, a good Samaritan, whether it's a rich uncle or whether it was Duke Medical Center, or someone had agreed to pay for this surgery notwithstanding your failure to do so. And so the surgery actually happened. You would have to pay for that because it was ultimately concluded that it was covered, right? So this is the scenario where the surgery happens and someone else pays for it. You'd have to pay for that, right? Assuming there is standing or a connection. Assuming everything else about this case is the case. So if he'd paid for it out of pocket, his rich uncle or Duke Medical Center had paid for the surgery, you'd be on the hook. Okay, let's try another one. And oh, to be clear, in that situation, it doesn't matter if he dies a week later, right? Whether he's alive or dead, if a good Samaritan had paid for this surgery, you'd have to reimburse, correct? Yes, again, correct, assuming the standing connection. And now let's imagine that he's still alive today. If he's still alive today, you'd have to pay for the surgery, right? If assuming that he has an obligation to pay back the good Samaritan, otherwise it's a gift. So, okay, it just seems weird to me that says in both scenarios, whether he's alive or dead, if the surgery had happened, you'd have to pay. And if he was still alive, you'd have to pay. But the one situation you don't have to pay is where we couldn't find a good Samaritan and he died before you concluded that you were in fact required to pay all along. That seems strange to me. Your Honor, I would put it, I would put it this way. It's a, it's a situation that obviously gives rise to sympathy. This case is not the first one of this nature. There have been cases like this even cited in our briefs going back 25 years. And the issue is, should this court take on itself the effort of revising ERISA to address this situation? This situation is a congressional, a legislative. So I thought, I thought your argument would be different. So I thought what you're going to say to Judge Hyten's hypothetical is that he left out the crucial fact in hypothetical two, right? When he said the defendant still, or sorry, the, the participant is still alive. The fact he left out is that he's still alive and needs the surgery still. Because if he doesn't need the surgery still, so if he's still, if it's denied, it turns out that the doctors were wrong and he doesn't need the surgery anymore and the doctors won't perform it because the surgery is dangerous. But they decided that the risk is passed. In that scenario, if he's alive and doesn't need the surgery anymore, then you wouldn't, you wouldn't be liable for it, right? Correct. That's, that's like my hypo of this, the PT sessions that are not needed. So in that, in that case, there would be no need for it. If, however, it was determined that he still did need the surgery, then he would have the right to pursue that. To provide. Right. But, okay, so, so I get that. And so, but all of that suggests that the, the remedy is plaintiff focused, right? And, and we see in lots of other cases, in particular, the Supreme Court's recent decision in Lew versus the SEC, that sometimes you can be simply defendant focused. And so it's not about what you took or what is owed or what belongs to the participant. It's about what you improperly got. Lew talks about disgorgement in a sort of stylized way. It's, it's version of disgorgement at least. And says that in that context, we don't, doesn't matter about the injury on the plaintiff's side. We're only defendant focused. And so PSA, as I understand it, got to keep the money in its account that it would have otherwise had to pay out. Why is it that in Lew's phrase, disgorgement, maybe more correctly, some form of unjust enrichment or constructive trust. Help me understand for other equitable remedies, why that's not like own all fours with what Lew is telling us equitable means. For a couple of reasons. First, as has been noted in so many of the cases, ERISA is a balancing public policy situation where this situation of making benefits available. I'm sorry, wait, say that again. So what you want me to do is balance public policy interests? No, what I'm getting at your honor is that ERISA itself has been, has been designed in a carefully balanced fashion. So encourage the provision of benefit plans, but that there are limitations. Why don't you skip the public policy arguments and go, go to what equitable remedies means, right? Rather than, I mean, you, you can write your congressman about your public policy arguments, right? I got a statute, right? It says in A3 other equitable remedies. I got cases that tell me what that means. Like I'm, I'm not interested in the public policy arguments. What the hypo that the court posed your honor suggests that that is a repackaging of a Bennett claim. So just enrichment claim. It's not a benefits claim at all. It doesn't care one bit about the plaintiff. It cares only about you. What you are, this is disgorgement. This is lube, right? Money that you shouldn't have. You kept money that you shouldn't have. It does. Well, that under the way, the equitable cases would work as we see it. Your honor is those cases, all of them cited in the briefs. And the, and the concept is that there has been some sort of a taking from the plaintiff to disgorge or the unjust enrichment is wrapped around some sort of taking that, that comes from the plaintiff. In that hypo, all we really have is a repackaging of a benefits claim. If we look at Korotinska, for example, which remains good law, that in Korotinska, the allegation was that the benefit claimed there was denied almost in a sign. And so Judge Wilkinson in Korotinska for the, for the court explained that, that whatever the concept, I'm sorry, whatever the circumstances are of a denial of benefits claim, that has to be rectified under A1B. It cannot become an A3 equitable claim. Otherwise you're simply repackaging a benefits claim. And that. Wait, but doesn't, that's what A3 says, right? To go back to what I mean, I agree with you that under lots of precedent, you can't succeed under A1B and A3. They are disjunctive. You can only, but when I read the text of A3, it presupposes that I don't have an A1 claim. I mean, the whole trigger for triggering A3 is you can only bring a claim under A3 if you don't have an A1 claim. But the argument that you're making now seems to say, if you're not making an A1 claim, you can't make an A3 claim. And I guess I'm saying textually, you can never have an A3 claim unless you don't have an A1 claim. So help me understand that. In the cases, and I'll mention that from plaintiff appellant's point of view, Rose, they indicated that the Christine S case is perhaps the most thoughtful analysis or the best one to look to. That case does thoroughly go through this area of the law. And I believe what that case explains and the other cases all line up with it is that you can have an A3 claim in an A1B benefits situation if there's a distinct injury, if there's a completely different theory of law. That is that you were unjustly enriched, right? Not that he missed out on anything. I sort of take your point as a pretty good one that like, in essence, in Judge Hyten's hypothetical, right, he no longer, the hypothetical two, whether he's alive or dead, he no longer needs the surgery, right? So we're fine there, right? So if I look at the plaintiff, I don't see a loss. When I look at you, I see an unjust gain. And that is the distinct claim from the plaintiff-focused version that you want to talk about the plaintiff. And that's a set of claims. I get that. But there's a whole separate set that don't look at the plaintiff, right? This is Lew itself, right? The whole fight there was the government didn't have any real interest in the story, right? But they say it doesn't matter. We're not looking at the plaintiff there. We're not looking at the party that's bringing the suit. We're looking at you and saying you got something that you don't deserve and we're going to take it. Understood, Your Honor. But what I would go back to is the way ERISA is structured. That claim is not cognizable because it is simply another way to look at a denial of benefits. So that claim is foreclosed, would be our position under the way the case law is presented. Every case that we have- Can you just help me just for a minute understand like how, maybe you say it's wholly unsupported, but how under the text I could possibly reach that conclusion? I'm not even understanding how in theory I can read the text to get there. A3 is for other claims that are not already addressed somewhere within the ERISA structure. Any denial of benefits- Do you think that A1B addresses this claim? I think that A1B addresses any situation- So you think PSA can be sued and held liable under A1B. You're conceding that argument. You've argued against that, it seems like to me. I am not conceding that A1B renders PSA or any of the other defendants liable. What I'm saying is A1B is for a denial of benefits claim and that is what we are dealing with by different words. Whether you call it unjust enrichment as a result of the denial, all we are focused on is the denial of benefits that triggers it. A1B is the exclusive remedy for any denial of benefits and the options that are in A1B are the ones available. How do you read that? But doesn't Amara and Peters, don't they essentially prevent that type of argument? Those were benefits claims too and they were- At this high level of generality that they ultimately arose out of. They were benefits claims, but there was something more there. They turn on additional claims, additional conduct. For example, in Amara, the argument as alleged was that there was a misrepresentation as to the coverage within the plan. That is a separate claim that gives rise to the possibility of A3 equitable relief to correct the misrepresentation. And once the misrepresentation was corrected and the plan coverage as it was represented, it was supposed to be, was invoked, then the benefits being sought were available. So here, if we were to take the hypo from the court and the idea was that there was a misrepresentation of some sort about the benefits being made available to Mr. Holman, then A3 could come in to address that inequity. But if we're dealing with as we are under these facts as alleged, nothing but a wrongful denial of a benefit and we're limited to A1B. And we have seen that the particular circumstances here where there was- There's a misrepresentation here, right? Because the ERISA plan implicitly or explicitly represents that it's going to operate in good faith and award benefits where they're deserved and not award them where not deserved. And they didn't do that. Well, the allegation is that the- That would, I mean, that would make any denial of benefits a, you know, maybe that is, maybe a- Is that the case? Is any denial of benefits that turns out to be wrong a breach of the fiduciary duty? No, but that would be the rule emanating from this case. I'm sure we would hear from the class action plaintiffs bar on any time we have a situation where a plan wrongfully denies negligently or intentionally, as was alleged in Kortenska, any benefit or part of a benefit. If you give, you know, a cheaper, cheaper medicine that's somewhat less effective, but still cures you. But, you know, but, you know, we monetize the difference or you're released from the hospital after two days and you really felt you could have used another day and your plan should have authorized the third day. All of a sudden we have class claims monetizing all of that. Benefits claims are under A1B and they do not, without a separate independent legal theory or additional tort-like action, go to A3. That's your argument that, that if it's, if the remedy effectively is, or if the claim is really tied to a benefits decision, you know, coverage or not, denial or not, you know, whether it results in unjust enrichment to a defendant or a loss, you know, of a benefit to a plaintiff, that is under the first theory. It's got a rise or fall there. It's not available and you, and your position is that you have to something such as in Amar, the misrepresentation about the change in plan, or in Peters, the kind of bundling up of the fees so the deductibles get higher, aside from just a denial or not. Correct, Your Honor. That is the position. Thank you. Can I just, I just want to make sure I understand the argument. So why, why would the theory of liability be what dictates the remedy? So A3 just says like other equitable remedies, right? And so that doesn't, it doesn't say, it doesn't, it doesn't seem on its face to turn on there being a separate theory of liability is what I'm saying. So A1B is one remedy for a theory of liability, but A3 seems like the catch that doesn't require a separate theory of liability. It's a separate type of remedy, right? And so you can have one theory of liability that has two possible sets of remedies, right? That, that's a common story, right? And so why, why does the theory of liability, what determines the distinction between A1B and A3? That is a, I agree with the Court, that is a common way to look at it. But Davila, for example, from the Supreme Court focuses on the idea that, that A3 is a safety net, not a catch-all, not a, is there any other way that I could be relieved here or is there any other benefit I could obtain or any other claim I might be able to bring? Let me top up into A3. A3 is a safety net if there is nowhere else under ERISA to go, and it is clear under Davila and, and the other cases that A1B is the source. So there has to be that separate claim, and that's what Christine S. and all of the other cases that have analyzed the interplay between, between A1B and A3 have come out to say. That's a, I mean, that may be right, but that, that, you know, that, that, that seems like it's fairly atextual. And I mean, the, the looking at the text, it doesn't read that way. Maybe, maybe the case law gets you there, but the text doesn't say it's a catch-all, doesn't read like it's a catch-all. You know, it seems like, yeah, anyway, that, I mean, we'll, you know, maybe the cases do it, but it doesn't look like Congress did it. Thank you. Unless there are any other questions, I see I'm well past my time, but thank you very much. Thank you, counsel. Mr., Mr. Boone, I think we'll hear from you. Thank you, your honor, and may it please the court. Brian Boone from Alston and Byrd for UMR. I appreciate the court's allowing me to appear by Zoom today, given the circumstances, and I apologize for my voice, and I'll be brief. I want to highlight one argument that applies uniquely to the non-PSA defendants, and that group is UMR, Quantum, and MCMC. And the argument is Rose acknowledged in her complaint that only PSA was responsible for paying benefits under the PSA plan. You can see that at pages 13 and 14, and Rose, I'll read the allegations. She alleges that PSA is the plan administrator, as well as the plan sponsor, that the plan is fully self-funded, and that PSA assumes the sole responsibility for funding plan benefits. So Rose has acknowledged in the complaint that the non-PSA defendants were not responsible for paying for the heart transplant, and that undermines the claims against the non-PSA defendants. They would have never been responsible for paying for the heart transplant because they were not responsible for paying benefits under the plan. In her appellate briefing, Rose says that she seeks the value of the heart transplant on the theory that it's the amount that the defendants avoided paying by the alleged conduct. And she says that theory sounds unjust enrichment, but that theory doesn't work against the non-PSA defendants because they didn't avoid any expense. But counsel, just to talk about that issue more, and maybe that's right. I mean, I certainly understand the position that your client wasn't enriched in the same way as the allegation goes because it wasn't supposed to pay the plan. But, you know, at least in the unjust enrichment, we got two words. One's unjust and one's enrichment. Maybe PSA didn't do anything unjust. And so, you know, how does that work? Would that, you know, insulate you because you're not enriched and insulate PSA because it didn't decide? I'm not suggesting that there should be any liability against PSA. I'm just saying that for the non-PSA defendants, they didn't avoid any expenses. They weren't responsible for paying for any claim under the PSA plan. So it's, they were never unjustly enriched in any sense. So that claim would fail. So I understand. Assume for a minute I agree with that. The problem is unjust enrichment is not the only theory that has been brought, right? There's also sort of a plaintiff-focused side, right, that they claim there was a loss that is compensable under A3. Help me understand why that doesn't work. Sort of assume away the unjust enrichment piece. Help me understand why, and assume that you're a fiduciary just for purposes of this answer. Why doesn't the loss that's alleged here suffice for an A3 claim? All right. Are you asking about an A3 claim against the non-PSA defendants, I take it? Yes. I'm putting PSA aside because I take your, you're not representing them. You're representing the servicers. And so what I'm trying to get at is if I take unjust enrichment away and I really focus only on a claim of loss under A3 and not unjust enrichment, why is that not equitable relief? Sure. I think I had two responses. The first is I'm not quite sure what the loss alleged is here. I know that in his briefing, Mr. Adams suggests that the loss might be DesKyrie's death, Mr. Holman's death, and also variously suggests that it could be the loss of a right under ERISA. So it's not, it's not clear to me exactly what the loss would be here, but in any case, awarding the estate... I take him to agree that it's not the death and the loss of life. I take him to be instead, it's the loss of the benefit. Sure. I guess my other response would be that 50283 focuses on remedies, right? So it's focused on appropriate equitable relief. And the Supreme Court cases make clear that compensatory damages that run against general assets never, ever, ever qualify as equitable relief. Right. And so I take his argument to be that's right. And that's why we haven't sued for his life, like this was a car wreck, because that'd be compensatory. But instead, what I'm suing for is the loss of the service that I was entitled to. Which sounds to me just like a repackaged version of the benefits claim that Mr. Adams had alleged in the complaint. In any case, Mr. Holman, your move is to go with PSA and say, if it has any relation to benefits, like it's got to be A1B or bust. I think that's what Cortesca says, Your Honor. Yes. I didn't mean to take up all your time. Anybody got other questions for him? The one other thing that I would say, if you would indulge me, about Peters. In Peters, I think this court said that there was something more. It was not just a straight-up benefits denial. There were allegations of self-dealing, I think, in that case by Aetna. So there was something more. It wasn't just a cut-and-dry benefits denial. And unless the court has any other questions, I'll yield. Thank you. Thank you, Mr. Boone. We appreciate you being with us and are glad to have you. Mr. Adams, I think we've got a few more minutes from you. Thank you, Your Honor. To that point, I guess, that the court discussed with both of my able counsel opponents, that it has to be connected. If it's in any way connected to an A1B claim, it has to be an A1B claim. That just practically doesn't make sense. First of all, Verity, Amara, Peters, all of those cases involved both. And in fact, they weren't able to determine a remedy until much further after a motion is dismissed. But their point is that those cases have a plus factor, right? They've got another issue. And so help me understand why that ... I mean, it is a distinction, right? So it is true that those cases involve some other claim. Help me understand why you think that distinction is one that doesn't matter. No, Your Honor. I think that's a great point. There is something more to this case. If the facts of this case were that they denied Mr. Holman's claim and a court later overturned it and called it a wrongful denial, I would agree there's not an A3 claim. But the facts of this case are they applied an exclusion that wasn't in the plan. They applied guidelines that they weren't allowed to apply. MCMC found alcohol before cardiac transplant is not listed as a because of those misrepresentations and because of those applying incorrect plan provisions, incorrect exclusions, incorrect guidelines that caused the loss, that caused the death. And so if you connect every ... I mean, it seems like their argument there is, yes, any wrongful denial by definition is wrongful, right? It's wrongful. It means they've misapplied something. And so that's not something more than a straight benefits denial. Well, Your Honor, I would disagree with their characterization because a representation that a plan requires six months of alcohol free in order to approve a benefit when there's no such exclusion in the plan. But that's not a ... But counsel, I mean, normally when you have a representation, you have a representation that induces some sort of action. That was a reason. And it may have been a wrong reason. Sounds like it was a wrong reason. But calling it a misrepresentation when it's a reason didn't induce any, you know, reliance. So, and I think that's, yeah, that is ... Just assume we disagree with you that there is a, and that we think there is a distinction. Tell us why that shouldn't matter. I think, Your Honor, under Amara and Verity, they are saying, and in the Jones case out of the Eighth Circuit, if there's an allegation of misconduct in the claims processing, which is what happened here, that's sufficient to withstand an A3 claim separate from an A1B claim on its own. And it makes sense because if there weren't that, then you could never ... A plan could apply the back of a Lucky Charms box to a claim. And if that person dies, then there's no relief. And that's just not a result that could ever be tenable. And certainly not what Congress intended in affording access to remedies, to sanctions, to access to the courts. You could, no matter how egregious the actions were, and they were egregious. I mean, there were three appeals that were denied on all statutes. Mr. Adams, can you just explain for me a minute? One of the challenges that I've got is that this theory that there's got to be a separate claim from a benefits denial doesn't seem to match up well with the text of the statute, right? Because A1B and A3 are distinct methods, right? They're not mutually exclusive in some sense that you require an additional claim in order to get into the A3 box. Why is it that the reason that those claims had an additional claim doesn't make any difference? Because that's the theory of liability, which is a different question than the remedy. If I'm understanding the question correctly, I think that it doesn't have to be connected. What Amara says is that there is fiduciary misconduct that leads to a loss. If there's just fiduciary misconduct, that's remediable with a claim for compensatory damages. Anything that a trustee, because a trustee has to be held to account to, and the unjust enrichment is a way of doing that also, but I think the A3 claim is separate under particularly with Verity's warning that where there's no adequate relief elsewhere. So even separately from that, if there is no A1B claim, which is what the defendants argue, the A3 claim stands alone because there's no other adequate relief available in the statute. Counsel, I have another question. Whether it's unjust enrichment or surcharge or those sort of equitable claims that I think, as Judge Richardson said, are defendant-focused rather than plaintiff-focused, do you have to show that the . . . and my question relates to PSA, the PSA defendants. Do you have to show that they did something wrong, that they did an action that caused those defendants to be able to retain money improperly? No, Your Honor. It's because of the way they set up their plan. They structured it for UMR to be the claims administrator for medical claims, for Quantum to also be named fiduciary. When you set up and delegate your fiduciary authority to others, then ultimately you're all responsible. So that's . . . but if they were . . . it sounds like your answer is maybe that might be an issue if they hadn't set the plan up and done it this way, if they were somehow insulated or distinct from whatever decision resulted in them retaining the money. But if it results from their . . . the plan they set up, it's kind of imputed to them. Is that the thought? Yeah. I can't think of . . . Your Honor, I can't think of a situation where the actual plan administrator and funder and actual plan . . . you know, because this happens a lot with medical. They look for medical . . . people with expertise, and there's a number of different companies like that out there, which I think goes to the point we talked about earlier. They did have something to gain from it. But when you set it up, you're not absolved of liability. And that's very standard in the Fourth Circuit where both the plan administrator and the plan and the people that made the discretionary decisions. We don't know exactly who made all of them. PSA was on the letterhead of the . . . at least the final . . . Yeah. I appreciate that issue may not be something we know at the pleadings. I'm just talking generally if the case were to proceed how that would need to be played out. But I appreciate your answer. I see no other questions, and I will thank the Court for the hearing today, and I appreciate it. Well, we certainly appreciate counsel's help on this case. We would normally come down and greet the one of you that's with us, but instead we'll greet you all from afar and hope that we have a chance to see you again where we can do it in person.
judges: Julius N. Richardson, A. Marvin Quattlebaum Jr., Toby J. Heytens